# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs August 1, 2013

## IN RE JUSTIN T. H.[1]

### Appeal from the Circuit Court for Greene County
### No. 10A012TJW    Hon. Thomas J. Wright, Judge

### No. E2012-02401-COA-R3-PT-FILED-SEPTEMBER 24, 2013

This is a termination of parental rights case in which Mother and Stepfather filed a petition to terminate the parental rights of Father to the Child. Following a bench trial, the trial court found that clear and convincing evidence existed to support the termination of Father's parental rights on the statutory ground of abandonment and that termination of his rights was in the Child's best interest. Father appeals. We affirm the decision of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which, CHARLES D. SUSANO, JR., P.J., and THOMAS R. FRIERSON, II, J., joined.

Jessica R. McAfee, Greeneville, Tennessee, for the appellant, Christopher S. H.

Linda T. Woolsey, Greeneville, Tennessee, for the appellees, Brandi N. W. and Jonathan B. W.

Leslie E. Douthat, Greeneville, Tennessee, guardian ad litem for the minor, Justin T. H.

---

[1]This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

**OPINION**

**I. BACKGROUND**

Justin T. H. ("the Child") was born out of wedlock to Brandi N. W. ("Mother") and Christopher S. H. ("Father") on August 4, 1998. Mother and Father married after the Child's birth but later divorced in April 2001. Father was tasked with submitting child support pursuant to a court order and was awarded limited visitation with the Child. Father's support obligation was suspended at the time of the divorce because he was incarcerated. Following his release, he petitioned the court for a reduction in the support obligation. The Child continually resided with Mother, who subsequently married Jonathan B. W. ("Stepfather") on August 4, 2006. As the years passed, Father's visitation with the Child became sporadic because the Child refused to participate in the scheduled visitation and because Father was incarcerated on different occasions for varying lengths of time. Visitation ceased at some point in 2008. According to Father, it was at that point that he stopped remitting support.

On April 13, 2010, Mother and Stepfather (collectively "Appellees") filed a petition to terminate Father's parental rights and a corresponding petition for Stepfather's adoption of the Child. They alleged that Father had abandoned the Child by failing to remit child support and by failing to visit the Child. Father objected, arguing that his alleged abandonment of the Child was a result of Mother's refusal to schedule visitation and to apprise him of her current residence, thereby prohibiting him from submitting child support because he did not know where to mail or hand deliver the payments.

A hearing was held over the course of two days on February 24, 2012 and September 11, 2012. In lieu of providing a transcript for this court's review, the parties submitted an agreed-upon statement of the evidence that was prepared by the trial court. *See* Tenn. R. App. P. 24(c). According to the statement of the evidence, LeAnn M. and Darryl A. testified that Appellees had "a reputation for truthfulness in the community and deserve[d] to be believed under oath." Kelley D. and David F. testified that Stepfather had "a reputation for truthfulness in the community and deserve[d] to be believed under oath."

Ginger L. and Eugene B. testified that they were employed by the Greene County School System while the Child was enrolled. They related that the Child had been placed in Eugene B.'s classroom for the 2008-2009 school year and in Ginger L.'s classroom for the 2009-2010 and the 2010-2011 school years. Eugene B. asserted that he also served as the Child's football coach for four years. Ginger L. and Eugene B. asserted that they never had any communication with Father during their involvement with the Child in their respective capacities with the school system.

Father, who was 36 years old at the time of trial, testified that he had graduated from high school but had not yet attained his associate's degree even though he was less than 30 hours from completing a degree in "business management/small business management." He acknowledged that he had been incarcerated for varying periods of time throughout the Child's life and that he had been in jail from June 2009 until August 2009, when he was placed in a half-way house. He stated that while he remained under supervision, he was allowed to return home in December 2009 and that he remained home until he violated his probation and was imprisoned from March 2010 until February 2012. He agreed that the relevant time period for the termination proceedings was December 2009 to March 2010. He asserted that he was not incarcerated during that time period and that he maintained minimal employment while residing in a mobile home that belonged to his grandfather.

Father testified that he maintained a job with Jiffy Lube from 1999 until 2002 and that he earned approximately $300 per week. He stated that he quit his job to manage his own collision repair and restoration body shop. He said that when he was not incarcerated, he operated his business in a building owned by his father and that he "took cars on consignment and had to pay for the parts" before he recouped income. His income depended upon the amount of work necessary to complete each job. He claimed that he earned "very little" after 2002. He asserted that he did not know how much he had earned but admitted that he worked on "some cars" during the relevant time period. He conceded that he had not actively sought alternative employment. He recalled that at one time in 2009, he intended to work for "Bill Gatton" but asserted that the situation simple "didn't work out" and that in 2012, he applied for another job and for Social Security benefits. He claimed that he suffered from various ailments but acknowledged that he was capable of performing manual labor on his family's farm and that he was knowledgeable enough to do "about anything", namely he could weld, paint, and provide manual labor on a farm.

Father did not introduce any records concerning his expenses or income during the relevant time period. He testified that he was not required to submit rent for his business or residence and that in return for his assistance on the farm, his father paid most of his bills and provided food for him during the relevant time period. He acknowledged that he currently owned several entertainment items, including paintball guns, pellet guns, BB guns, a 4-wheeler, a go-cart, a crossbow, and various other items. He admitted that he was also able to purchase Christmas and birthday gifts for the Child and that he had also purchased multiple pets, including a snake, iguana, and a dog for the Child. He acknowledged that he had owned several vehicles and at least seven cellular telephones, that he usually owned a dog, and that he was able to purchase cigarettes and had smoked approximately one-half of a pack of cigarettes per day until he quit smoking eight months prior to trial. He also admitted "taking" methamphetamine and prescription drugs, including "Alprazalam" and "Cyboxin" prior to his incarceration in 2010.

Relative to child support, Father admitted that he had not remitted child support during the relevant time period and that he last submitted child support "sometime in 2008." He claimed that he had not seen the Child since 2008 and that he had not submitted support because he usually paid Mother when he saw the Child. He asserted that he could not remit his child support payments to Mother because she refused to tell him where she lived. He conceded that he knew where she worked and where her maternal grandmother lived and that he was able to call Mother and the Child on their respective cellular telephones.

The Child, who was 14 years old at the time of trial, testified that he wanted Stepfather to adopt him. He recalled that when he visited Father, Father slept most of the day and rarely played with him or showed him attention. He stated that in the evenings, Father took him to the body shop, where he was left to entertain himself. He claimed that he was often responsible for cooking what little food Father had and that when Mother learned that Father rarely provided food, she sent food for him to eat during visitation. He asserted that he hid from Mother when it was time for him to visit Father and that Mother often had to force him to visit Father. He claimed that Mother continued to encourage him to visit Father even after she granted his request to cease visitation. He testified that he did not want "any contact" with Father and claimed that he had already changed his last name on his schoolwork and that he provided Stepfather's last name to his sports teams.

Mother testified that she had been employed as a registered nurse at Laughlin Memorial Hospital in Greeneville, Tennessee for approximately ten years. She claimed that Father had visited her place of employment on occasion to return the Child and that she had maintained the same cellular telephone number. She admitted that she refused to tell Father her current address. She explained that she was "scared" of him and that although he did not know where she lived, he knew her current cellular telephone number, where she worked, and where her mother lived.

Mother stated that she and Father were married in January 1999, separated in June 2000, and finally divorced in April 2001. She asserted that Father had not remitted any child support since Spring 2006. She acknowledged that she never sought to enforce his child support obligation and that in 2008, she refused to comply with his repeated requests for visitation. She explained that during one of the last visits, she received a telephone call from Father, who was "talking disjointedly about random things" and was slurring his speech. She opined that she experienced other problems concerning visitation and that she eventually stopped forcing the Child to visit Father. She insisted that despite her concerns, she never discouraged the Child from visiting Father.

Stepfather testified that he was employed by Greene County and that he also volunteered at Greene County Emergency Medical Services. He confirmed that Father had

not remitted child support since his marriage to Mother in August 2006. He asserted that he loved the Child and wished to adopt the Child.

Following the presentation of the above evidence, the trial court terminated Father's parental rights to the Child and granted the petition for adoption. In so holding, the court rejected the statutory ground of abandonment based upon Father's failure to visit but found clear and convincing evidence that Father had abandoned the Child by willfully failing to remit child support during the relevant four-month time period, namely December 2009 through March 2010, and for an additional period of time prior to June 2009. The court stated that Father was aware of his duty to remit support, had the ability to work, had provided for himself and supported his various habits with his income, and had not asserted any justifiable excuse for his failure to remit support. The court further found that termination of Father's parental rights was in the Child's best interest. This timely appeal followed.

## II. ISSUES

We consolidate and restate the issues raised on appeal by Father as follows:

A. Whether clear and convincing evidence supports the trial court's termination of Father's parental rights to the Child pursuant to Tennessee Code Annotated section 36-1-102.

B. Whether clear and convincing evidence supports the trial court's ruling that termination of Father's parental rights was in the Child's best interest pursuant to Tennessee Code Annotated section 36-1-113(I).

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

> (2) [t]hat termination of the parent's or guardian's rights is in the best interest [] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2010, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn. 2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36-1-113, the reviewing court must

then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim. *State Dep't of Children's Servs. v. Mims*, 285 S.W.3d [435,] 447-48 [(Tenn. Ct. App. 2008)]; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004). Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010).

## IV. DISCUSSION

### A.

Father concedes that he failed to remit child support during the relevant time period but asserts that his failure to remit support was not willful. He argues that he was unable to submit support because he did not have regular and stable employment during the relevant time period and because Mother refused to provide a current address. He asserts that the trial court erred in considering his ability to support himself as evidence of his willfulness to withhold support. Appellees respond that the trial court did not err in finding that Father had abandoned the Child by willfully failing to remit support.

The Tennessee Code provides, in pertinent part,

(1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:

* * *

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4)

consecutive months immediately preceding such parent's or guardian's incarceration[.]

* * *

(B) For purposes of this subdivision (1), "token support" means that the support, under the circumstances of the individual case, is insignificant given the parent's means[.]

Tenn. Code Ann. § 36-1-102(1)(A), (B) (emphasis added). A parent's willful failure to support the child or make reasonable payments toward support of the child "means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D).

This court has consistently held that the term willfulness as it applies to a party's failure to support a child must contain the element of intent. *In re Swanson*, 2 S.W.3d 180, 188-89 (Tenn. 1999). Indeed, "defining abandonment as the mere non-payment of support [is] unconstitutional because this language creates an irrebuttable presumption of abandonment, irrespective of intent." *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003) (citing *In re Swanson*, 2 S.W.3d at 188). The element of intent utilized in termination proceedings "does not require the same standard of culpability as is required by the penal code." *In re Audrey S.*, 182 S.W.3d at 863. "Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent." *Id.* "[A] person acts 'willfully' if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing." *Id.* at 863-64. Additionally, "'[f]ailure to support a child is 'willful' when a person is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide the support, and has no justifiable excuse for not providing the support.'" *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005) (quoting *In re Adoption of T.A.M.*, No. M2003-02247-COA-R3-PT, 2004 WL 1085228, at *4 (Tenn. Ct. App. May 12, 2004)).

Despite Father's assertion to the contrary, consideration of Father's expenses and income and how he spent his money was proper. This was not a case where a parent had numerous expenses but faithfully provided support when he or she was able. *See In re Dylan H.*, No. E2010-01953-COA-R3-PT, 2011 WL 6310465, at *7 (Tenn. Ct. App. Dec. 16, 2011) (reversing the trial court's termination decision because mother was simply unable to fulfill her child support obligation during the relevant time period). In this case, Father admitted that he did not submit any support even though his expenses were minimal. The record reflects that he was not required to submit rent for his residence or business and that his

father provided groceries in return for manual labor on the farm. His assertion that he was unable to submit support because of his employment situation was simply unavailing when he admittedly left stable employment and when he chose to provide more than the basic necessities for himself rather than support the Child. He admitted that he recouped some income during the relevant time period and that he was somehow able to obtain cigarettes, cellular telephones, multiple cars, methamphetamine, and other illegal drugs for himself. Additionally, he could have searched for employment elsewhere or used his various skills to garner additional income to fulfill his support obligation.

We reject Father's assertion that he was unable to remit support because Mother refused to provide an address. He knew how to contact Mother and could have visited her place of employment or her mother's residence to remit support. With these considerations in mind, we conclude that Father was aware of his support obligation, had the capacity to remit support, made no attempt to remit support, and provided no justifiable excuse for his failure to remit support. We further conclude that there was clear and convincing evidence to establish that Father willfully failed to remit child support during the relevant time period. Thus, a statutory ground existed for termination of Father's parental rights.

B.

Having concluded that there was clear and convincing evidence supporting the statutory ground for termination, we must consider whether termination of Father's parental rights was in the best interest of the Child. Although Father has not appealed the court's best interest finding, we have reviewed the issue because of the gravity and finality that this decision will have on Father's parental rights. *See In re Arteria H.*, 326 S.W.3d 167, 184 (Tenn. Ct. App. 2010) (considering the best interest issue even though the issue was not raised on appeal). Following our review, we conclude that there was clear and convincing evidence to establish that termination of Father's parental rights was in the best interest of the Child pursuant to Tennessee Code Annotated section 36-1-113. Accordingly, we affirm the trial court's termination of Father's parental rights.

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Christopher S. W.

_____
JOHN W. McCLARTY, JUDGE

-9-